# EXHIBIT A

NYSCEF - New York State Courts Electronic Filing (Live System)

<< Return to **Search Results**

## 651678/2023 - New York County Supreme Court

Short Caption: **Z PAYMENTS SOLUTION CORP. v. FIRST DATA MERCHANT SERVICES LLC et al**
Case Type: **Commercial - Contract**
Case Status: **Pre-RJI**
eFiling Status: **Partial Participation Recorded**

E-mail Participating Parties

**Narrow By Options**

| Document Type: | Please select... | ▾ | Filed By: | |
| --- | --- | --- | --- | --- |
| Please select... | ▾ | | | |
| Motion Info: | | ▾ | Filed Date: | |
| 📅 | thru | 📅 | | |
| Document Number: | | | | |

Display Document List with Motion Folders 📁

Sort By: Doc # ▾

| # | Document | Filed By | Status |
| --- | --- | --- | --- |
| 1 | SUMMONS + COMPLAINT | Liu, K.<br>Filed: 04/04/2023<br>Received: 04/04/2023 | **Processed**<br>Confirmation Notice |
| 2 | EXHIBIT(S) - 1<br>*Contract* | Liu, K.<br>Filed: 04/04/2023<br>Received: 04/04/2023 | **Processed**<br>Confirmation Notice |
| 3 | EXHIBIT(S) - 2<br>*Notice of breach* | Liu, K.<br>Filed: 04/04/2023<br>Received: 04/04/2023 | **Processed**<br>Confirmation Notice |
| 4 | EXHIBIT(S) - 3<br>*Termination Notice* | Liu, K.<br>Filed: 04/04/2023<br>Received: 04/04/2023 | **Processed**<br>Confirmation Notice |
| 5 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>*First Data Merchant Services LLC* | Liu, K.<br>Filed: 04/05/2023<br>Received: 04/05/2023 | **Processed**<br>Confirmation Notice |
| 6 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>*Fiserv, Inc.* | Liu, K.<br>Filed: 04/05/2023<br>Received: 04/05/2023 | **Processed**<br>Confirmation Notice |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE | Liu, K.<br>Filed: 04/06/2023<br>Received: 04/06/2023 | **Processed**<br>Confirmation Notice |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- X

Z PAYMENTS SOLUTION CORP.

Plaintiff

-against*

FIRST DATA MERCHANT SERVICES LLC and
FISERV, INC.

Defendants.

-------------------------------------------------------------------- X

To the above-named
defendant(s):

Index#:

Date Filed:

**SUMMONS**

Plaintiffs Address: 649
E. 169th Street
Bronx, N.Y. 10456

The basis of venue is:
Parties Consent

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this

summons, exclusive of the date of service (or within thirty (30) days after the service is complete

if this summons is not personally delivered to you within the State of New York) and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated New York, New York

April 3, 2023

Kai Yin Liu, Esq.

Attorneys för Plaintiff

(212)966-8282

195 Canal Street, Suite 205,

New York, N.Y. 10013

KAI YIN LIU@HOTMAIL.COM

Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 4 of 55

Defendant's Address:

First Data Merchant Services,

LLC 4000 NW 120th Avenue,

Coral Springs Florida 33065


Fiserv, Inc.

4000 NW 120th Avenue, Coral

Springs Florida 33065

Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 5 of 55

SUREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-----------------------------------------------------------X          Index#:

Z PAYMENTS SOLUTION CORP.

                    Plaintiff,

      v.          **VERIFIED COMPLAINT**

FIRST DATA MERCHANT SERVICES LLC
and FISERV INC.

                    Defendants.

-----------------------------------------------------------X

      PLAINTIFF, Z PAYMENTS SOLUTION CORP. ( Z Payments) by its attorney, Kai Yin

Liu, complaining of the Defendants First Data Merchant Services LLC (First Data) and Fiserv

Inc (Fisrev) hereby alleges as follows:

### NATURE OF THE ACTION

1.  This action arises out of defendants, First Data and Fiserv's breach of their contractual

    obligations to pay plaintiff, Z Payments for its services in marketing the defendant's

    program of processing and settlement of bank card transactions for merchants and the

    soliciting of merchants to enter into agreements with the defendants for use of it's

    program. The parties entered into this agreement by contract dated June 30, 2021.

    Pursuant to the terms of this agreement, the parties agreed to a split of processing fees

    and residual payments as per an attached schedule.

2.  Plaintiff, Z Payments performed under the agreement from June 2021 until breach and

    unlawful termination of the agreement by the defendants on or about May, 2022.

3. As a direct result of the plaintiff's efforts, a substantial number of merchants entered into agreements to utilize the defendant's program, resulting in payments to the defendants.

4. However, on or about May 27, 2022 the defendants wrongfully and unilaterally terminated the parties agreement, alleging fraud by the plaintiff and withheld payment of plaintiff's rightful fees including residuary payments due under the contract.

Z Payments brings this action to recover approximately $1,000,000 currently owed to it, plus the fees and costs incurred in bringing this action.

### The Parties

5. At all times hereinafter mentioned, plaintiff was and is a domestic business corporation duly organized in and under the laws of the State of New York.

6. At all times mentioned herein, plaintiff's principal place of business and office was and still is 649 E. 169th Street, Bronx County, N.Y.

7. Upon information and belief, defendant, First Data Merchant Services, LLC, (hereafter First Data) is a limited liability corporation duly organized in and under the laws of the State of Florida and has its principal office at 4000 NW 120th Ave. Coral Springs, Fl. 33065 and is a wholly owned subsidiary of Fiserv Inc.

8. Upon information and belief, defendant Fiserv is a Delaware corporation with its principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin, 53045.

9. This lawsuit arises out of actions taken and business transacted within the State of New

York, as alleged below and this Court has jurisdiction on the basis of CPLR 302. Pursuant to the terms of the parties agreement, defendant First Data consents to personal jurisdiction in this Court.

10. Venue is proper in this Court under CPLR 501 and 503 because First Data consented and agreed to venue in this Court in the agreement at issue.

### The Facts: The Marketing Agreement

11. On or about June 30, 2021, the plaintiff entered into a marketing agreement with defendants, whereby the parties agreed that the plaintiff would market the defendant's program for bank card processing and settlements to individual merchants. In exchange for the plaintiff's signing up merchants for the defendant's program, the parties agreed that the plaintiff would be compensated pursuant to a schedule agreed to by the parties. Exh.1

The marketing agreement was to run for a term of five years.

The parties agreed that plaintiff's portion of payments would be deposited by defendants to plaintiff's designated bank account on a monthly basis.

The parties further agreed that the plaintiff would be entitled to "Residual" payments generated by merchants that the plaintiff previously signed up to the program. These residual payments were likewise to be deposited by defendants on a monthly basis, to the plaintiff's designated bank account.

The parties performed pursuant to their agreement until on or about April 27, 2022, at which point defendant Fiserv sent a notice of breach to the Plaintiff . Exh.2

The Defendants alleged in their notice of breach, that the plaintiff on-boarded merchants by providing signatures on merchant applications from unauthorized individuals, as well as boarding specific merchants that already had existing accounts under an agreement with Z-ATM Corp. and CardConnect, LLC, an affiliate of defendant First Data.

By letter dated May 27,2022, defendant Fiserv served the plaintiff with a notice of termination of the parties contract and wrongfully retained residual and other processing payments due to the plaintiff. Exh.3

## AS AND FOR A FIRST CAUSE OF ACTION

12. Plaintiff, repeats the allegations made in paragraphs 1 through 11 with the same force and effect as if set forth herein.

13. The defendants' breached the parties agreement by wrongfully cancelling said agreement on the allegation that plaintiff committed fraud in the process of on-boarding new merchants to the defendants' program.

14. As a result of this breach of the agreement, the plaintiff has been damaged in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR A SECOND CAUSE OF ACTION

15. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "14" of the complaint as if fully set forth herein.

16. The defendants' breached the parties agreement by wrongfully cancelling the parties

Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 9 of 55

agreement on the grounds that the plaintiff on-boarded certain named merchants when the

merchants already had existing accounts under an agreement between Z ATM Corp. and

CardConnect, an affiliate of First Data.

17. As a result of this breach of the agreement, the plaintiff has been damaged in an

amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses

incurred by the plaintiff including attorney's fees.

## AS AND FOR A THIRD CAUSE OF ACTION

18. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through

"17" of the complaint as if fully set forth herein.

19. The parties agreement included an implied covenant of good faith and fair dealing.

20. As a result of the defendants' wrongful cancellation of the parties agreement, the

defendants' have violated the implied covenant of good faith and fair dealing.

21. As a result of this breach of the agreement, the plaintiff has been damaged in an

amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses

incurred by the plaintiff including attorney's fees.

## AS AND FOR A FOURTH CAUSE OF ACTION

22. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through

"21" of the complaint as if fully set forth herein.

23. Pursuant to the terms of the parties agreement, if the defendants believed that the plaintiff engaged in "fraudulent or illegal activity …or activity that is materially injurious" to the defendant in good faith, then the defendant was required to consult with the plaintiff and work together to remedy any and all such issues.

24. The defendants breached the agreement between the parties by failing and refusing to abide by the terms of said provision, in violation of the parties agreement in that they failed to consult with the plaintiff and work together to remedy any and all such issues.

25. As a result of this breach of the agreement, the plaintiff has been damaged in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR A FIFTH CAUSE OF ACTION

26. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "25" of the complaint as if fully set forth herein.

27. Upon information and belief, defendant First Data was charged by the Federal Trade Commission (FTC) with knowingly and consciously avoiding knowing, that transactions they processed were defrauding consumers.

28. Upon information and belief, as a result of said FTC charges, defendant First Data was required to be subject to monitoring and agreed to payment of a $40,000,000 judgment in favor of the Commission.

29. Upon information and belief, defendant First Data was subject to monitoring at the time it entered into the agreement with the plaintiff in June, 2021.

30. The parties agreement included an implied covenant of good faith and fair dealing.

31. The defendant, First Data breached the implied covenant of good faith and fair dealing by failing to disclose to the plaintiff that it was subject to monitoring at the time of entering into the parties agreement.

32. But for the defendant's failure to disclose this fact, the plaintiff would not have entered into the agreement between the parties and would not have lost revenues wrongfully retained by the defendants.

33. As a result of the defendants failure to disclose said material information, they breach the implied covenant of good faith and fair dealing owed to the plaintiff, resulting in damage to the plaintiff in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR A SIXTH CAUSE OF ACTION

34. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "33" of the complaint as if fully set forth herein.

35. Pursuant to the parties agreement, the defendants were required to pay the plaintiff residual fees on existing merchant accounts on a monthly basis. The defendants have breached the terms of the parties agreement by failing and refusing to do so.

36. As a result of this breach of the agreement, the plaintiff has been damaged in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

FILED: NEW YORK COUNTY CLERK 04/04/2023 10:00 AM
NYSCEF DOC. NO. 1   Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 12 of 55

INDEX NO. 651678/2023
RECEIVED NYSCEF: 04/04/2023

## AS AND FOR A SEVENTH CAUSE OF ACTION

37. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "36" of the complaint as if fully set forth herein.

38. Pursuant to the parties agreement, the defendants were required to pay the plaintiff residual fees on existing merchant accounts on a monthly basis.

39. The defendants have breached the terms of the parties agreement by wrongfully retaining and converting to their own use said residual payments..

40. As a result of this breach of the agreement, the plaintiff has been damaged in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR A EIGHTH CAUSE OF ACTION

41. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "40" of the complaint as if fully set forth herein.

42. Pursuant to the terms of the parties agreement, the parties agreed that the plaintiff would incur certain per batch charges chargeable on a daily basis, however, the defendants charged said amounts on an hourly basis, in violation of the terms of the said agreement.

43. As a result of this breach of the agreement, the plaintiff has been damaged in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR AN NINETH CAUSE OF ACTION

44. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "43" of the complaint as if fully set forth herein.

45. Defendants, breached the parties agreement by wrongfully terminating said agreement and retaining the plaintiff's residual payments.

46. As a result of the defendants' breach and retention of plaintiff's funds the defendants were unjustly enriched, resulting in damages to the plaintiff in an amount to be determined at trial, but believed to be $5,000,000 along with the fees and expenses incurred by the plaintiff including attorney's fees.

## AS AND FOR A TENTH CAUSE OF ACTION

47. The plaintiff repeats and realleges the allegations contained in paragraphs "1" through "46" of the complaint as if fully set forth herein.

48. Pursuant to the terms of the parties agreement, the defendants agreed to indemnify the plaintiff for its attorney fees and costs of defense resulting from defendants' breach of their obligations under said agreement.

49. The defendants have breached the parties agreement.

50. As a result of this breach of the agreement, the plaintiff has incurred attorney's fees and costs of lawsuit in an amount to be determined at trial, but believed to be at least $200,000.

## REQUEST FOR RELIEF

**WHEREFORE,** plaintiff respectfully requests judgment in its favor against the defendants as follows:

(a) On its First Cause of action in the amount of $5,000,000 plus interest;

(b) On its Second Cause of Action in the amount of $5,000,000 plus interest;

(c) On its Fourth Cause of Action in the amount of $5,000,000 plus interest;

(d) On its Fifth Cause of Action in the amount of $5,000,000 plus interest;

(e) On its Sixth Cause of Action in the amount of $5,000,000 plus interest;

(f) On its Seventh Cause of Action in the amount of $5,000,000 plus interest;

(g) On its Eighth Cause of Action in the amount of $5,000,000 plus interest;

(h) On its Nineth Cause of Action in the amount of $5,000,000 plus interest;

(i) On its Tenth Cause of Action in the amount of $250,000 plus interest.

Along with fees and expenses of this action, as well as other and further relief as this Court may deem just and proper.

Dated: New York, N.Y.

April 3, 2023

Respectfully submitted,

Kai Yin Liu, Esq.

Attorney for Plaintiff

Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 15 of 55

195 Canal St. suite 205

New York, N.Y. 10013

(212)966-8282

## VERIFICATION

I, Kai Yin Liu, as the attorney of record for the plaintiff, Z Payments Solution, in the within action hereby affirm that I have read the foregoing answer and know the contents thereof to be true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe to be true. The reason this verification is made by me and not the plaintiff is that the plaintiff resides in a county other than where I have my office.

New York, N.Y.

April 3, 2023

Kai Yin Liu

Exh.1

# Marketing Agreement

This Marketing Agreement (this **Agreement**) is among Z Payments Solution Corp (**ISO**, **Customer**, or **Client**), First Data Merchant Services LLC (**First Data**), and Wells Fargo Bank, N.A. (**Bank**), and is dated June 30, 2021 (the **Effective Date**).

## Background

- First Data and Bank (together, the **Service Providers**) have established and maintain the Program for the processing and settlement of Bank Card transactions.

- Service Providers wish to contract with ISO to market the Program to merchants, and ISO is willing to perform such services, on the terms and conditions in this Agreement.

- ISO, First Data, and Bank agree as follows:

## 1   Definitions

Initially capitalized terms used and not otherwise defined in this Agreement shall have the meaning set forth in the *Definitions Appendix*.

## 2   Obligations of ISO

2.1   ISO shall use commercially reasonable efforts to solicit merchants to execute Merchant Applications with Service Providers and shall actively promote the Program; provided, however, that ISO shall not solicit any merchants that fall under the merchant categories identified on Schedule B, as it may be modified by Service Providers in their sole discretion (or as it may have been modified by Services Providers since November 2020), which merchant categories are always unacceptable under the Program.

2.2   In furtherance of ISO's solicitation of merchants, ISO will:

    (1)   communicate to merchants the existence and availability of the Program, provided that the nature and content of such communication shall be approved by Service Providers;

    (2)   distribute promotional materials approved by Service Providers regarding the Program to merchants; and

    (3)   perform other reasonable services which ISO and Service Providers deem desirable to promote and market the Program. ISO may not make any representation or warranty with respect to the Program or any products or services that ISO offers or refers to merchants or Merchants under this Agreement that is inconsistent with or in addition to the written representations and warranties, if any, provided by Service Providers or the provider or owner of such products or services, as applicable.

2.3   ISO shall instruct merchants and Merchants to furnish Service Providers with such financial information as Service Providers may from time to time request. ISO will call to Service Providers' attention any information that it reasonably considers relevant to a determination of any merchant's or Merchant's creditworthiness.

2.4   ISO shall comply with all Program Standards. Program Standards may be established or changed by Service Providers from time to time in their sole discretion on prior written notice to ISO.

2.5   ISO shall obtain such information and take such action as Service Providers may from time to time reasonably require in connection with their processing of merchants or Merchants, including:

(1) requires the IC to comply with all applicable terms of this Agreement and all applicable Rules and Requirements of Law, and

(2) prohibits the making of any representation or creating any liability on behalf of Service Providers.

2.11 During the Term of this Agreement, and for such longer period of time after termination of this Agreement as may be provided in Section 17, ISO agrees that it will not, directly or indirectly, on behalf of itself or any other person or entity, perform Bank Card processing services for any of the Merchants developed by ISO under this Agreement, or contact or solicit any such Merchant for the purpose of providing Bank Card processing services (the **Nonsolicitation Obligation**).

## 3   Obligations of Service Providers

3.1 In addition to its other obligations stated elsewhere in this Agreement, Service Providers shall be responsible for all processing and accounting functions relating to the clearing and settlement of Transactions, including:

(1) Merchant processing and settlement;

(2) Merchant or merchant credit research (other than matters to be performed by ISO under Section 2.5 of this Agreement);

(3) Merchant customer activation and credit approval;

(4) Merchant security and recovery;

(5) Merchant customer services;

(6) Merchant Chargeback and retrieval services;

(7) All other Back Office Services;

(8) Final classification of Merchants (e.g., high, medium, or low risk) under the Program Standards in the sole discretion of Service Providers; and

(9) Negotiation and termination of Merchant Applications and Merchant Agreements.

3.2 All debits and credits covered by this Agreement shall be subject to audit and final checking by Service Providers, and prompt adjustment shall be made for any inaccuracies discovered. Bank is responsible only for obligations under this Agreement that are required to be performed by a member bank under the Rules of Visa and MasterCard. Debit sponsorship may be provided by another bank.

## 4   Acceptance of Merchant Applications; Credit Risk

4.1 Service Providers shall be under no obligation to enter any Merchant Application with any merchant solicited by ISO. If Service Providers enter a Merchant Agreement, Service Providers may terminate such Merchant Agreement in accordance with its terms.

4.2 Service Providers will perform credit reviews on merchants. ISO understands that Service Providers will, in their sole discretion, make the final decision as to whether a merchant meets the Program Standards or other credit criteria given by Services Providers, and will not accept those merchants who do not meet the Program Standards or other credit criteria given by Service Providers. Service Providers will assume the risks associated with the Bank Card processing relationship for those Merchants with a valid Merchant Agreement signed by Service Providers, except as otherwise provided in this Agreement.

4.3     ISO shall be liable to Service Providers for all losses associated with merchant or Merchant relationships with Service Providers where the Merchant Application submitted by ISO contains significant inaccuracies or omissions (including signature by an unauthorized individual), if ISO had actual knowledge, or should have had knowledge based upon reasonable due diligence, of the inaccuracies or omissions at the time the Merchant Application was submitted to Service Providers.

4.4     Service Providers may, in their sole discretion, refuse to accept Merchant Applications from any employee of ISO, IC, or Other MSP that Service Providers reasonably believe is or has been engaging in fraudulent or illegal activity or activity that is Materially injurious to Bank, Cardholders, Payment Brands, or Service Providers; provided, however, that if Service Providers reasonably believe that any employee of ISO, IC, or Other MSP is or has been engaging in such activity, in good faith, Service Providers will consult with ISO, and Service Providers and ISO will work together to remedy any and all such issues.

4.5     No assignee for the benefit of creditors, successor in interest, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff, or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Agreement.

## 5     Confidentiality

5.1     Service Providers and ISO agree that they will not divulge or disclose to third parties, without the written consent of the other, any Confidential Information. ISO acknowledges and understands that the terms and conditions of this Agreement are Confidential Information. No party will obtain any proprietary rights to any Confidential Information of another party.

5.2     Service Providers shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Applications, Merchant Agreements, Merchant accounts and records, and other information regarding the Program, or performance by First Data or Bank of services or obligations under this Agreement, but excluding any other information regarding the business of ISO, to the extent that such disclosure by Service Providers is for a bona fide business purpose, including to perform taxpayer identification number validation and otherwise manage or facilitate compliance with Internal Revenue Service and state reporting/withholding regulations.

5.3     In connection with any reporting, account management, or information services (**Information Services**) that First Data or its Affiliates may make available to ISO, First Data will issue to ISO access codes or user IDs with passwords (**Access Codes**) so that ISO may access certain First Data systems during the Term, as determined by First Data in its sole discretion, to view certain data relating to Transaction processing services under this Agreement.  Access to the Information Services by ISO is subject to any applicable instructions, user manuals, terms of use, online support, or other documentation. ISO agrees that by accessing or using any such Information Services, it has received and agrees to the terms of use in connection with the relevant Information Service. Access Codes are the property of First Data.

ISO acknowledges and agrees that:

(1)     it is responsible for implementing and maintaining systems to ensure that Access Codes are distributed only to ISO's designated officers, employees, and agents who are authorized by ISO to use the applicable First Data system,

(2)     ISO's officers, employees, and agents protect the confidentiality of the Access Codes and of information obtained through use of the Access Codes,

(3)     ISO's officers, employees, and agents use their respective Access Codes and the applicable First Data systems only for their intended purposes, and

(4)     ISO immediately notifies First Data in writing of the termination of any of ISO's officer's, employee's, or agent's authority to use an Access Code.

4

5.4     ISO shall, and shall instruct each of its officers, employees, and agents to, use the degree of care in protecting the secrecy of the Access Codes that ISO uses to protect Cardholder data, but in no event less than a commercially reasonable degree of care. ISO shall maintain compliance with PCI DSS along with security systems sufficient to protect Access Codes and all Confidential Information contained in or accessed by ISO via any Access Code, and shall ensure that all such data and information is protected by ISO behind firewalls or on servers inaccessible to third parties. ISO shall immediately notify First Data in writing upon the occurrence of a breach of its obligations in this paragraph. If, in accessing any First Data system, ISO receives any confidential information of any third party, including any Transaction-related information of any third party other than ISO, or any personal financial information of any consumer, ISO shall notify First Data immediately and shall not use, copy, or disclose such information to any third party.

5.5     First Data's obligation to provide the Information Services to ISO will terminate automatically without penalty to First Data or its Affiliates upon the earlier of:

(1)     the termination or expiration of this Agreement, or

(2)     the occurrence of any event causing First Data to cease providing the Information Services to ISO.

5.6     Upon termination of the Information Services, the respective Access Codes shall be rescinded, ISO shall not be permitted to use the respective service, and all rights, licenses, and sublicenses granted regarding such service, whether real or implied, shall be terminated.

5.7     *First Data does not make and expressly disclaims any representation or warranty:*

(1)     *That access to Information Services will be uninterrupted or error free;*

(2)     *That security breaches will not occur concerning any information communicated through any Information Services, the internet, or any common carrier communications facility; and*

(3)     *As to the results that may or may not be obtained in connection with use of the Information Services; First Data shall not have any liability of any kind to ISO regarding use of Information Services or any information obtained from them.*

5.8     ISO agrees that ISO's Confidential Information may be made available to Payment Brands or to supervisory or regulatory authorities of ISO or Service Providers upon their request.

5.9     If a party breaches this Section 5, the non-breaching party will suffer irreparable harm and the total amount of monetary damages for any injury to such party will be impossible to calculate and therefore an inadequate remedy. Accordingly, the non-breaching party may:

(1)     seek temporary and permanent injunctive relief against the breaching party, or

(2)     exercise any other rights and seek any other remedies to which the non-breaching party may be entitled to at law, in equity, and under this Agreement for any violation of this Section 5. The provisions of this Section 5 shall survive the expiration or termination of this Agreement.

## 6     Compliance with Laws; Rules

6.1     ISO will comply fully with (1) all Rules that are publicly available, made available to ISO by Service Providers, or available to ISO upon request from any Payment Brands; and (2) Applicable Requirements of Law. This Agreement is made subject to the Rules and ISO acknowledges and agrees to be bound by all applicable Rules, including the Rules regarding member service providers and independent sales organizations. ISO agrees to indemnify and hold harmless Payment Brands and their respective members for any failure by ISO to comply with the Rules, and to allow such parties to directly enforce

the Rules. The Rules shall control to the extent of any inconsistency with the terms and conditions of this Agreement. This Agreement shall be automatically amended to reflect any change in any applicable Rule.

6.2 ISO will assist First Data and Bank in facilitating and managing compliance of the Program and Merchants with applicable Rules, including PCI DSS, and Requirements of Law by (1) Enrolling or entitling Merchants in or for services or products deemed by Service Providers, in their reasonable discretion, to facilitate such compliance; and (2) Complying with First Data operational requirements deemed by Service Providers, in their reasonable discretion, to facilitate such compliance (collectively, the **Compliance Management Services**). As of the Effective Date, Compliance Management Services include the PCI Compliance Service Program (as described in Schedule A, Section 3 of this Agreement, as it may be renamed from time to time), and First Data product solutions and operational procedures that relate to and help manage and support the reporting requirements under Section 6050W of the Internal Revenue Code and implementing Treasury Regulations, along with similar state laws, and the regulatory changes associated with the Durbin Amendment dated July 21, 2010 to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Service Providers will provide ISO with written notice of any additional Compliance Management Services.

## 7    Merchant Applications; Merchant Agreements

7.1 ISO shall use only the then-current form of Merchant Application that has been designated and approved by Service Providers and made available to ISO. Service Providers may from time to time amend or change the Merchant Application or a Merchant Agreement in their sole discretion. There may not be any separate or other agreement between ISO and any merchant or Merchant in any way relating to such merchant's or Merchant's participation in the Program. The parties acknowledge and agree that nothing in this agreement shall prohibit ISO from entering a separate agreement with a merchant or Merchant regarding:

(1)    services unrelated to the Program, and

(2)    the sale, lease, and/or rental of point-of-sale terminals and other equipment if such equipment is not being provided by the Service Providers.

7.2 All Merchant Applications, Merchant Agreements, and Merchant accounts and records shall be and remain the exclusive property of Service Providers. ISO acknowledges and agrees that all Merchant Applications, Merchant Agreements, and Merchant accounts and records are owned by Service Providers and may not be transferred, assigned, sold, or exchanged by ISO.

## 8    Discount Fees, Other Merchant Fees

Except with respect to fees that are set at a fixed amount as stated in Schedule A or the applicable product terms and conditions, the **Discount Fee** and other fees charged to a Merchant under the Merchant Application or Merchant Agreement, including Merchant Application fees, statement fees, service fees, minimum fees, chargeback fees, authorization fees, transaction fees, and early termination fees (if any) may be recommended by ISO, but in all cases, will be subject to approval at any time by Service Providers in their sole discretion, which approval shall not be unreasonably withheld.

## 9    Fees

9.1 During the Term of this Agreement and for such longer period of time after termination as may be provided in Section 17: (1) ISO agrees to pay Service Providers the fees listed in Section 1 of Schedule A along with any Minimum Processing Fees owed by ISO;. and (2) First Data will pay ISO residuals, on a monthly basis, in an amount equal to: (a) the Net Fees incurred by Merchants during the immediately preceding calendar month for each Billing Item listed on Schedule A, multiplied by (b) the applicable percentage share. **Net Fees** are the fees incurred and paid by a Merchant under its Merchant Agreement for each Billing Item identified on Schedule A less the Processing Fee for that Billing Item.

DocuSign Envelope ID: A93a8a71-29-02-68766-4C88c7D6cument 1-1   Filed 05/02/23   Page 23 of 55

First Data may credit ISO's Designated Account for amounts owed pursuant to this Agreement and Service Providers may reduce the amount of any payments to be made to ISO by any sums that are due and owing or reasonably expected to be due and owing from ISO to Service Providers or their Affiliates, including the amount of any previously paid fee attributable to any Merchant refund that is made at the request of ISO.

9.2    Service Providers may from time to time:

     9.2.1    Pass through to ISO increases in the non-controllable fees, costs, and charges in Schedule A of this Agreement, including Special Fees and Pass-Through Costs and Interchange, to reflect any increases in such fees, costs, and charges to Service Providers, upon 10 days prior written notice to ISO.

     9.2.2    Modify Schedule A for any Permitted Price Increase by providing 30 days prior written notice to ISO, or solely with respect to Merchants referred by ISO after the effective date of the price change. A **Permitted Price Increase** refers to any pricing change that (1) applies to all similarly situated partners of First Data, or (2) establishes compensation associated with new or additional services.

     9.2.3    Upon 30 days' prior written notice to ISO, implement a surcharge fee on those Transactions processing on a third party's platform.

If there are any fee increases to ISO, Service Providers shall provide reasonable assistance to ISO in passing such fee increases through to Merchants under the Merchant Agreements.

9.3    For any service provided by First Data that is not identified in this Agreement (including Schedule A) or covered by a separate agreement, ISO shall pay First Data for such service at First Data's then-current standard rate.

## 10    ISO's Future Residuals

At any time after the conclusion of the 24th month of the Initial Term of this Agreement, ISO may sell ISO's right to receive future residual payments relating to Merchants developed by ISO under to this Agreement (**ISO's Future Residuals**), subject to Section 5 of this Agreement and the following terms and conditions. ISO grants to First Data a right of last refusal to purchase ISO's Future Residuals. If ISO receives a bona fide offer from a willing and able buyer to purchase ISO's Future Residuals (an **Offer**), ISO shall notify First Data of the terms and conditions (including the amount) of such Offer. First Data shall have the last right to purchase ISO's Future Residuals for an amount and on terms equal to the Offer, and ISO shall not sell or in any way transfer any rights to ISO's Future Residuals without first presenting First Data with the opportunity to match any such Offer. First Data shall have 15 days to notify ISO of its decision whether to exercise its right to purchase ISO's Future Residuals. If First Data does not elect to exercise this right, ISO may sell ISO's Future Residuals to the third-party offeror under the terms of the Offer and ISO shall provide First Data with documentation evidencing that such sale complied with Section 10. In addition, First Data may require that ISO and the third party promptly execute a residual direction letter in a form acceptable to First Data. Nothing in this Section 10 shall be construed or interpreted to impair any of Service Providers' rights under this Agreement, including Section 7.2 or to give ISO the right to sell or assign any Merchant, Merchant Application, or Merchant Agreement. The only interest or asset that ISO may transfer or sell under this Agreement is ISO's Future Residuals.

## 11    Establishment of Accounts; Appointment of Agent

11.1    ISO will establish and maintain a Designated Account during the Term and for such period of time following termination of this Agreement that ISO is entitled to receive residual payments under this Agreement.

11.2   ISO authorizes Service Providers to make any payment owed to ISO or collect any charge owed by ISO and accruing from time to time under this Agreement by making the appropriate credit or debit to the Designated Account. Service Providers shall notify ISO if at any time there are insufficient funds in the Designated Account to cover any amount that is due and owing to Service Providers. ISO shall immediately pay such amount to Service Providers.

**12     American Express Authorization and Capture Services**

12.1   At ISO's request, First Data shall provide authorization for a Merchant's American Express Transactions for American Express Transactions that are not covered under the American Express **OptBlue**. Such services shall include authorization only or authorization and capture. ISO agrees and understands that First Data will provide American Express authorization services only if Merchant has entered a separate merchant agreement with American Express under which Merchant may accept the American Express Bank Card.

12.2   ISO agrees and understands that First Data shall provide American Express authorization (and capture) services only and that Service Providers shall in no respect be responsible for the funding of such Transactions. Funding shall be the sole responsibility of American Express.

**13     Audits; Books and Records; Financial Statements**

13.1   During the Term of this Agreement and for a period of 2 years afterward, ISO shall allow representatives of Service Providers, Payment Brands, or Governmental Bodies to, during normal business hours, inspect ISO's place of business to conduct financial and procedural audits and make copies of ISO's books, accounts, records, and files regarding ISO's performance of services under this agreement. ISO shall make available records containing merchant or Merchant records as may be requested from time to time by Service Providers or Payment Brands, their designees, or any Governmental Body as soon as possible but no later than 7 business days from the date of the request. The ISO shall bear all costs relating to any audit or investigation of ISO or an Other MSP that is triggered by the action or inaction of ISO, including its ICs and Other MSPs.

13.2   ISO shall provide Service Providers with financial statements on an annual basis within 6 months of the close of ISO's fiscal year and on a more frequent basis if so requested by Service Providers. Financial statements shall be audited or, if audited financial statements are not available, prepared in accordance with generally accepted accounting principles. Service Providers shall maintain all financial statements provided by ISO in confidence and shall not use or disclose any statement except as contemplated by this Agreement or required under the Rules.

13.3   ISO shall have the right on an annual basis to request copies of First Data's relevant books, accounts, records, and files for the sole purpose of verifying payments to be received by the ISO from First Data under this Agreement. ISO shall bear all costs related to such audit.

**14     Promotional Materials; Marks**

14.1   Upon request by ISO, Service Providers will provide ISO and Merchants, at Service Providers' then-current charges, with promotional materials indicating the participation of ISO and Merchants in the Program, and supplies, including Sales Drafts, credit vouchers, and other forms. Upon termination of this Agreement, ISO and Merchants shall:

(1)   immediately discontinue and shall no longer use any promotional materials identifying Service Providers;

(2)   immediately remove any references to Service Providers from its website(s); and

(3)     immediately discontinue and shall no longer use any promotional materials containing any trade name, trademark, service mark, or logotype associated with Bank Cards (**Marks**), except to the extent such use may be authorized under a separate agreement.

14.2    ISO acknowledges and agrees that Payment Brands are the owners of their respective Marks and may at any time and without notice prohibit ISO from using the Marks for any reason. ISO agrees that it shall not contest the ownership of any Mark.

14.3    ISO shall not use any Mark on its own behalf and shall not suggest, imply, or in any manner create an impression that it is a member of any Payment Brand, that it is other than a member service provider or independent sales organization of Service Providers, or that any Payment Brand in any way endorses ISO or the services provided by ISO. ISO shall not state or imply in any correspondence, supplies, materials, and/or solicitations directed to any Merchant or merchant that the Bank Cards or merchant materials of any other member of any Payment Brand are being replaced, are invalid, or should be destroyed.

All Program materials including Merchant Applications, Merchant Agreements, Merchant statements, websites, and promotional materials:

(1)     must comply with the Program Standards (including, without limitation, the **Sponsor Bank Brand Usage Guidelines**);

(2)     to the extent required under the Program Standards, must be reviewed and approved by Service Providers before use;

(3)     must clearly and conspicuously disclose Service Providers' name and location by city and state;

(4)     may not represent Service Providers as having all aspects of the Program; and

(5)     may not state or imply that ISO is participating in any activity precluded by the Rules.

ISO shall have no authority to permit use of any of the Marks by any of its agents. All promotional materials used by ISO shall clearly disclose that the each of the Merchant Application and Merchant Agreement is between Service Providers and the merchant or Merchant. All proposed promotional materials requiring Service Providers' review and approval shall be submitted to Service Providers at least 10 days before the proposed use.

14.4    ISO shall not under any circumstances use the Marks on any marketing materials, including business cards and letterhead on stationery. Except to the extent permitted under the Program Standards, ISO will not use any trade name, trademark, service mark, or logotype associated with Service Providers in any advertising, promotional, or display materials without Service Providers' prior written approval.

14.5    Nothing contained in this agreement shall prohibit or limit ISO's use of the Marks to the extent such use is authorized under a separate agreement between ISO and a third party.

## 15    Indemnity

15.1    ISO agrees to indemnify, defend, and hold harmless Service Providers, Payment Brands, and their respective Affiliates, officers, directors, employees, and permitted assigns from and against any loss, liability, damage, penalty, or expense (including attorney's fees and cost of defense) (**Damages**) suffered or incurred as a result of:

(1)     any breach of its obligations under this Agreement;

(2)     any warranty or representation made by ISO to Service Providers being false or misleading;

(3) any representation or warranty made by ISO to any third person other than as specifically authorized by this Agreement or the Program Standards;

(4) any failure by ISO to fully comply with the Rules or any rules, regulations, order, and requirements of any Governmental Body;

(5) the amount of any fees that ISO establishes in or regarding any Merchant Application or Merchant Agreement, including Discount fees, Merchant Application fees, statement fees, service fees, minimum fees, chargeback fees, authorization fees, transaction fees, and early termination fees, if any, whether or not approved by Service Providers;

(6) any fraud by ISO or any IC;

(7) any act of any IC;

(8) any action, claim, or dispute brought by any third party, including any merchant, arising out of, or related to any agreement between ISO and any Merchant regarding services unrelated to or not included in the Program, including the sale, lease, and/or rental of point-of-sale terminals;

(9) any claim of any employee, agent, officer, director, shareholder, IC, or Other MSP of ISO for any compensation, benefit, or other payment to such person; or

(10) any action, claim, or dispute that relates to the ownership, control, or operation of ISO in connection with ISO's rights, interests, duties, and obligations under this Agreement (**Dispute**) brought by: (a) any ISO Related Party against ISO, any ISO Related Party, or a third party, or (b) any third party against ISO, any ISO Related Party, or another third party, in each case, regardless of whether First Data or Bank is named as a defendant or otherwise involved in such Dispute, unless such Dispute is the result of First Data's or Bank's gross negligence or willful misconduct. An **ISO Related Party** is any current or former employee, agent, director, officer, shareholder, member, partner, IC, or Other MSP of ISO.

Notwithstanding anything to the contrary in Section 18, if (1) ISO or any personnel, agent, IC, or Other MSP of ISO assert that ISO or any personnel, agent, ICs, or Other MSP of ISO is employee of First Data or Bank; or (2) a Governmental Body asserts or determines ISO or any personnel, agent, IC, or Other MSP of ISO are employees of First Data or Bank then ISO shall indemnify, defend, and hold harmless First Data or Bank and each of their respective Affiliates, officers, directors, and employees from any and all Damages and exemplary, punitive, or special damages associated with such claim and/or determination whether or not litigation is started, incurred by, or asserted against First Data or Bank.

15.2 Service Providers each agrees to indemnify, defend, and hold harmless ISO and its Affiliates, officers, directors, and employees from and against any loss, liability, damage, penalty, or expense (including attorney's fees and costs of defense) suffered or incurred as a result of:

(1) its breach of its obligations under this Agreement, or

(2) its failure to comply fully with the Rules or any rules, regulations, orders, and requirements of any Governmental Body.

## 16    Reimbursement

ISO shall reimburse Service Providers through setoff or upon demand for all assessments, fines, and penalties imposed by a Payment Brand or any Governmental Body to the extent such assessment, fine, or penalty results from any action or inaction by ISO or any IC.

## 17    Renewal and Termination

17.1    The **Initial Term** of this Agreement shall commence on the Effective Date and continue for 5 Processing Years through December 31, 2026. After that date, this Agreement will be automatically renewed for successive terms of 3 Processing Years each (each, a **Renewal Term**) unless a party provides written notice to the other parties at least 6 months before the expiration of the then-current term. The Initial Term and each Renewal Term are collectively the **Term**.

17.2    Bank or First Data shall have the right to immediately terminate this Agreement by written notice upon the occurrence of any of the following:

(1)    Material breach of this Agreement by ISO which is not cured by ISO within 30 days of receipt of written notice from Bank or First Data;

(2)    ISO's repeated breach of any Rule, or ISO's breach of any Rule that is Material;

(3)    fraudulent activity by ISO, or any action by ISO reasonably deemed to be injurious to Bank, First Data, Cardholders, or a Payment Brand;

(4)    termination of Bank's status as a licensed full processing bank or the insolvency of Bank;

(5)    termination of the Bank's relationship with First Data generally or with respect to the sponsorship of ISO;

(6)    deregistration of ISO by a Payment Brand;

(7)    cessation by Service Providers of Bank Card processing operations;

(8)    insolvency or bankruptcy of ISO which is not dismissed within 60 days; or

(9)    if at any time and in good faith, Bank or First Data reasonably believe that there has been a Material adverse change in ISO's financial condition or there is any Material impairment in the prospect of performance by ISO of any of its obligations under this Agreement.

17.3    ISO shall have the right to immediately terminate this Agreement by written notice upon the occurrence of any of the following:

(1)    Material breach of this Agreement by Service Providers which is not cured by Service Providers within 30 days of receipt of written notice from ISO; or

(2)    insolvency or bankruptcy of either of Service Providers which is not dismissed within 60 days.

17.4    Following the nonrenewal or earlier termination of this Agreement:

(1)    ISO will promptly discontinue its solicitation of Merchants and promotion and recommendation of the Program;

(2)    Except for the circumstances addressed in Section 17.4(3), ISO shall continue to comply with its Merchant servicing obligations under this Agreement. ISO further agrees to pay the applicable Payment Brand registration fees necessary for ISO to continue servicing the Merchant portfolio. ISO shall pay such registration fees prior to the date First Data is required to pay the Payment Brands for such registration(s) and First Data may collect those amounts from ISO through a reduction of residual payments otherwise due to ISO. ISO shall continue servicing the Merchant portfolio following termination until such time as the total amount of any residual paid to ISO under Section 9 in any calendar month is less than $5,000, at which time ISO's servicing obligation will terminate and ISO will no longer be obligated to pay the fees listed in Schedule A and First Data will no longer be required to make residual payments to

ISO under Section 9, after which First Data will own all Merchant Applications and Merchant Agreements developed by ISO under this Agreement free and clear;

(3) In the event ISO notifies First Data that following the Term ISO does not wish to renew its registration with the Payment Brands or continue servicing the Merchant portfolio, or following any termination: (a) under Section 17.2(1), 17.2(2), 17.2(3), or 17.2(5) or (b) at a time when the residual payment owed to ISO under Section 9 is less than $5,000 per calendar month, then effective as of the date of termination, ISO's servicing obligation will terminate and ISO will no longer be obligated to pay the fees listed in Schedule A and First Data will no longer be required to make residual payments to ISO under Section 9. For the avoidance of doubt, First Data will own all Merchant Applications and Merchant Agreements developed by ISO under this Agreement free and clear following termination under any of the circumstances described in this Section 17.4(3);

(4) First Data may adjust the Processing Fees in Schedule A (to the extent applicable following the Term) to First Data's then-current standard pricing and rates upon notice to ISO; and

(5) ISO shall continue to comply with the Nonsolicitation Obligation until the date that is twenty four (24) months after First Data stops making residual payments to ISO as provided in Section 17.4(2) or 17.4(3), as applicable.

## 18    Limitation of Liability

18.1 Service Providers' total aggregate liability to ISO for all losses, damages, costs, or expenses (including reasonable attorneys' fees) arising in connection with this Agreement (regardless of the form of action or legal theory) shall not exceed the Processing Fees paid to Service Providers under this Agreement in the 12 months preceding the event giving rise to such claim.

18.2 Service Providers shall not be liable for:

(1) any punitive or exemplary damages of any kind; or

(2) any special, indirect, consequential, or incidental damages of any kind (including lost profits) even if such party has been advised of the possibility of such damages.

## 19    Relationship of the Parties

Except for the purpose of ISO's solicitation of merchants on behalf of Service Providers in accordance with the terms and conditions of this Agreement, this Agreement does not create a relation of principal and agent, and, except as expressly provided in this Agreement, no party is to be considered to be the agent or legal representative of another party. ISO is not authorized to make any warranty or representation on behalf of Service Providers except as specifically authorized by this Agreement. It is expressly understood that ISO and Service Providers are in all other respects independent parties to a contract. ISO agrees that, except as otherwise expressly provided in this Agreement, it will not represent to any person that it is the agent of Service Providers, nor will it fail to correct any misunderstanding as to status.

## 20    Registration and Reporting; Sponsor Bank

20.1 Service Providers shall register ISO with MasterCard and VISA as a member service provider and independent sales organization, respectively. ISO shall provide Service Providers with all documentation and execute such documents as may be necessary for such registrations and any renewals, and shall allow Service Providers to review all such documentation as necessary during the Term of this Agreement and for such longer period of time after termination of this Agreement as may be required by the Rules. ISO shall reimburse Service Providers for all fees paid by Service Providers for such registrations and renewals. ISO agrees to comply with all renewals and reporting requirements

applicable to member service providers and independent sales organizations. ISO agrees to provide Service Providers with prior written notice of any proposed change of ownership of ISO.

20.2    First Data will use commercially reasonable and good faith efforts to retain Bank as a sponsor bank for ISO. ISO acknowledges and agrees that Bank and First Data may terminate their relationship or Bank may terminate its sponsorship of ISO. If this occurs, or Bank ceases to be a member bank of Visa or MasterCard, First Data will use commercially reasonable and good faith efforts to timely secure a replacement member bank to sponsor the ISO and the Program and assist with the transfer of Bank's rights and obligations under this Agreement and the Merchant Agreements to the replacement member bank.

20.3    First Data shall give commercially reasonable notice to ISO if: First Data receives notice that Bank is terminating its membership in Visa or MasterCard or Visa or MasterCard is terminating Bank's membership; or First Data gives or receives notice that Bank and First Data will terminate their relationship regarding the sponsorship of ISO.

## 21    Training

ISO shall adequately train all its employees and IC's and use reasonable efforts to cause its employees to perform in accordance with this Agreement, the Rules and any training guidelines that may be provided by Service Providers or Payment Brands. Upon request by Service Providers, ISO shall certify in writing that each of its employees and IC's has successfully completed training. ISO shall provide copies of all proposed training materials to Service Providers for its approval before use. ISO shall not use any training materials that have not been approved in writing by Service Providers, which approval shall not be unreasonably withheld, delayed, or conditioned.

## 22    Amendments

Except as otherwise contemplated in Sections 3.2, 6.1, or 9.2 of this Agreement or in Section 3.3 of Schedule A of this Agreement, no provision of this Agreement may be amended, changed, or waived except by a written agreement signed by Service Providers and ISO.

## 23    Employees; ICs and Sales Locations

ISO will provide Service Providers with a list of the names of all its employees and ICs, and such additional information as Service Providers may reasonably request from time to time regarding any employee or IC. ISO will provide Service Providers with a current list of ISO's employees, ICs, and Other MSPs at the end of each calendar quarter. ISO will conduct appropriate background checks (including credit and criminal background checks) on all employees and ICs. Upon receipt of a request from Service Providers or any Payment Brand, ISO will provide Service Providers or a Payment Brand, as applicable, with a current list of each of ISO's sales locations.

## 24    Waiver

No term or provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other party, whether express or implied, is not a consent to, waiver of, or excuse for any different or subsequent breach.

## 25    Assignment

Except as expressly provided in this Agreement, ISO shall not assign, transfer, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party any right or obligation under this Agreement, by operation of law or otherwise, without the prior written consent of Service Providers, which may be granted or withheld at the sole discretion of Service Providers. For purposes of this Agreement, any transaction or series of transactions resulting in a transfer of ownership or voting control of ISO of 20% or more shall be considered

DocuSign Envelope ID: Case 1:23-cv-03702-LGS Document 1-1 Filed 05/02/23 Page 30 of 55

an assignment or transfer of this Agreement. Service Providers may subcontract all or any part of the services or its obligations, but, regardless of any such subcontract, shall remain primarily responsible for performance of the services or such obligations.

**26     Notices**

All notices and other communication required or permitted under this Agreement shall be in writing and shall be deemed delivered when given by personal delivery, or first-class mail, postage prepaid, addressed as follows:

26.1    If to Service Providers, notice should be sent to:

**Wells Fargo Bank, N.A.**                **First Data Merchant Services LLC**

P.O. Box 6079                             4000 NW 120th Avenue, MS/CON-ISO
Concord, CA 94524
Attn: EVP Merchant Services               Coral Springs, FL 33065


**with a copy to First Data General Counsel at:**

6855 Pacific Street
Omaha, Nebraska 68106
Attn: Legal Department


26.2    If to ISO:

649 E. 169th Street
Suite 1B
Bronx, NY 10456
Attention: President

or to such other address as a party may, by like notice, designate to the other parties.

**27     Cooperation**

Service Providers and ISO will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated will comply with all applicable laws, regulations, and Rules.

**28     Severability**

The invalidity of any paragraph or subparagraph in this Agreement shall not affect the validity of any other paragraph or subparagraph in this Agreement.

**29     Counterparts**

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and such counterparts shall together be one and the same instrument.

## 30    Publicity

Neither Service Providers nor ISO will initiate a press release or any publicity relating to this Agreement without the prior written approval of the other party; provided, however, that Service Providers may use and release ISO's name in general customer lists without ISO's prior approval.

## 31    Entire Agreement, Binding Effect, Governing Law, Exclusive Jurisdiction, and Venue

This Agreement, including any schedules, exhibits, or attachments, embodies the entire understanding and agreement of the parties regarding the subject matter of this Agreement and replaces any marketing agreement or similar agreement previously entered between the parties. This Agreement will not become legally binding and may not be enforced by any party until and unless approved by the Credit Department of First Data and/or Bank. This Agreement shall be binding upon and shall inure only to the benefit of the parties to this agreement and their respective successors and assigns. Nothing in this Agreement, express or implied, is intended to confer or shall be deemed to confer upon any persons or entities not parties to this Agreement, any rights or remedies under or by reason of this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of law principles.

**Authorized Signatures:**

By: _____ Nabil Ziad _____

Name: _____ Nabil Ziad _____

Title: _____ President _____

Date: _____ 4/21/2021 _____

First Data Merchant Services LLC

By: _____ Jason Williams _____

Name: _____ Jason Williams _____

Title: _____ SVP _____

Date: _____ 4/27/2021 _____

**Wells Fargo Bank, N.A.**

By: _____

Name: _____

Title: _____

Date: _____

LEGO051032    WF Retail Marketing Agmt_Co-Pilot (04.13.2021)

# Definitions Appendix

When used in this Agreement, the following terms shall have the meanings below (each of which includes the singular and the plural):

**Access Codes** is defined in Section 5.3 of this Agreement.

**Affiliate** means any entity that directly or indirectly controls, is controlled by, or is under common control with a party.

**American Express** means American Express Travel Related Services Company, Inc., a New York corporation, including its successors or assigns.

**Back Office Services** may include receiving customer calls directly from Merchants, point-of-sale help desk services, fraud monitoring, credit approval, new account entry, and decision making regarding retrievals and Chargebacks.

**Bank Card** means a credit card, debit card, or other card type (or other device, functionality, or form factor used as a card substitute) that is issued by or under the authorization of a Payment Brand or licensee of a Payment Brand and bearing the respective trade names, trademarks, and/or trade symbols of the Payment Brand.

**Business Day** means any day on which Bank is open for business, other than Saturdays, Sundays, or state or federal holidays.

**Cardholder** means any authorized user of a Bank Card.

**Chargeback** means a disputed charge by a Cardholder or rejected Sales Draft that is returned unpaid for any reason by the issuer of the Bank Card.

**Compliance Management Services** is defined in Section 6.2 of this Agreement.

**Compliance Service Fee** is defined in Section 3 of Schedule A to this Agreement.

**Confidential Information** means all proprietary, secret, or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers, and the Program, including proprietary information of Payment Brands, pricing information, Merchant Applications, Merchant Agreements, Merchant accounts and records, customer lists, Cardholder account numbers, computer access codes, instruction and/or procedural manuals, and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information:

a)  is already known to the receiving party free of any restriction at the time it is obtained;

b)  is subsequently learned from an independent third party free of any restriction and without breach of this Agreement;

c)  becomes publicly available through no wrongful act of the receiving party;

d)  is independently developed by the receiving party without reference to any Confidential Information of the other; or

e)  is required to be disclosed by law.

**Credit Transaction** means the exchange, return of, and adjustment on merchandise or services sold by a Merchant in a Sales Transaction and the face amount of that Transaction when used in this Agreement in reference to payments to the Cardholder.

**Damages** is defined in Section 15.1 of this Agreement.

DocuSign Envelope ID: A9C53D4F-E72E-4E27-849B-8265F7B4C837
Case 1:23-cv-03702-LGS Document 1-1 Filed 05/02/23 Page 33 of 55

**Designated Account** means a commercial account maintained by ISO with Bank or a bank of ISO's choice located in the United States (as defined by Visa) that has the ability to accept automated clearing house transactions from the Federal Reserve.

**Discount Fee** means a percentage of the face amount of each Transaction that Service Providers may retain before payment to a Merchant as established under Section 8 of this Agreement and in each Merchant Agreement.

**Discover** means DFS Services LLC (f/k/a Discover Financial Services LLC), including its successors or assigns.

**Dispute** is defined in Section 15.1(10) of this Agreement.

**Effective Date** is defined in the first paragraph of this Agreement.

**Governmental Body** means any foreign, federal, state, local, or other governmental authority or administrative or regulatory body.

**IC** is defined in Section 2.10 of this Agreement.

**Including,** whether capitalized or not, means "including but not limited to."

**Information Services** is defined in Section 5.3 of this Agreement.

**Initial Term** is defined in Section 17.1 of this Agreement.

**ISO Related Party** is defined in Section 15.1(10) of this Agreement.

**ISO's Future Residuals** is defined in Section 10 of this Agreement.

**Liquidated Damages** is defined in Section 2.2.2 of Schedule A to this Agreement.

**Marks** is defined in Section 14.1 of this Agreement.

**MasterCard** means MasterCard International Incorporated, including its successors or assigns.

**Material** means, when used with reference to information, a fact or circumstance, a course of action, a decision-making process, or other matter, shall be limited to information, facts, and circumstances, courses of action, decision-making processes, or other matters as to which there is a substantial likelihood that a reasonable person would attach importance.

**merchant** means a retailer (or any other person or entity) that accepts Bank Cards for payment of goods or services.

**Merchant** means a merchant that is solicited by ISO on behalf of Service Providers under the terms of this Agreement, approved by Service Providers, and a party to a Merchant Agreement.

**Merchant Agreement** means the Merchant Application entered between Service Providers and a merchant approved by Service Providers regarding such merchant's participation in the Program.

**Merchant Application** means the form of Bank Card merchant application and agreement in use by Service Providers.

**Minimum Processing Fees** is defined in Section 2.1 of Schedule A to this Agreement.

**Non-Receipt of PCI Data Validation Fine** is defined in Section 3 of Schedule A to this Agreement.

**Nonsolicitation Obligation** is defined in Section 2.11 of this Agreement.

**Offer** is defined in Section 10 of this Agreement.

**Other MSP** is defined in Section 2.10 of this Agreement.

**Pass-Through Costs and Interchange** means the amounts charged by Payment Brands (including interchange fees, dues, and assessments, and debit network fees) in connection with a merchant's transactions.

**Payment Brand** means Visa, MasterCard, Discover, American Express, or any other association, network, or organization that issues or authorizes the issuance of a Bank Card.

**PCI Compliance Service Program** is defined in Section 3.1(1) of Schedule A to this Agreement.

**PCI DSS** means the payment card industry Data Security Standard (or any successor standards) as established by the applicable Payment Brands.

**PCI Provider** is defined in Section 3.1 of Schedule A to this Agreement.

**Processing Fees** means all fees and charges in Section 1 of Schedule A to this Agreement, as adjusted from time to time by Service Providers consistent with this Agreement, and any payment for Minimum Processing Fees, but such term excludes Special Fees, Pass-Through Costs, and Interchange, and all charges for taxes and interest.

**Processing Year 1** means the period commencing on the Effective Date and ending on December 31, 2022.

**Processing Year** means Processing Year 1 or each subsequent 12 calendar month period commencing on the first day of January and ending on the last day of December, as applicable.

**Program** means Service Providers' program of merchant participation in Bank Card processing systems to facilitate transactions and related services as described in the Merchant Application.

**Program Standards** means:

the credit criteria, standards, and policies and procedures established by Service Providers and provided in writing to ISO for ISO's use in connection with the solicitation of merchants, including Schedule B to this Agreement, as such Schedule B may be modified by Service Providers in their sole discretion (or as it may have been modified by Service Providers since November 2020);

the **Sponsor Bank Brand Usage Guidelines** made available to ISO in connection with this Agreement; and

other policies, procedures, assessments, fines, and penalties established by Service Providers and provided to ISO in writing that are designed to promote Merchant satisfaction, to preserve relationships with Merchants, to facilitate the growth of the Program, and to ensure the financial safety or soundness of Service Providers and the Program.

**Renewal Term** is defined in Section 17.1 of this Agreement.

**Requirements of Law** means any foreign, federal, state, and local laws, statutes, regulations, rules, codes, or ordinances enacted, adopted, issued, or promulgated by any court or Governmental Body or common law or any consent decree or settlement agreement entered with any Governmental Body.

**Rules** means all bylaws, rules, operational regulations, procedures, and guidelines promulgated by Payment Brands, as they may from time to time be amended. In the case of Discover, regarding performance of its obligations under this Agreement, ISO shall comply with Rules applicable to Acquirers (as defined in Discover's Rules).

**Sales Draft** means a form provided or approved by Service Providers to be executed by a Cardholder as evidence of a purchase of merchandise or services from a Merchant using a Bank Card.

**Sales Transaction** means a sale by a Merchant of merchandise or services using a Bank Card and the face amount of the sale when used in this Agreement in reference to payments to the parties.

**Service Providers** is defined in the Background Section of this Agreement.

**Special Fees** means the amounts payable by ISO on a pass-through or reimbursement basis for services or goods provided by certain third parties, including gateway fees, surcharges, customer specific setup fees, tariff line rates,

18

WATS lines rates, data circuit charges, and any other rates charged to First Data by a communications common carrier, postage costs (at the 1st class rate), courier costs, and costs of forms.

**Term** is defined in Section 17.1 of this Agreement.

**Total Annual Processing Fees** shall have the meaning provided in Section 2.1 of Schedule A to this Agreement.

**Transaction** means each Sales Transaction, Credit Transaction, or Chargeback.

**VISA** means, individually, or collectively, as appropriate, VISA U.S.A., Inc. or VISA International, including their respective successors or assigns.

**Year 1 Minimum Fees** shall have the meaning provided in Section 2.1 of Schedule A to this Agreement.

LEGO051032                                    WF Retail Marketing Agmt_Co-Pilot (04.13.2021)

# Schedule A

**1**     **Fees and Residual Payments**

1.1    During the Term of this Agreement and for such longer period of time after termination as may be provided in Sections 9 and 17, ISO shall pay Service Providers the following amounts in connection with the Merchants developed under this Agreement:

(1)    Special Fees and Pass-Through Costs and Interchange;

(2)    all fees and other amounts due third party processors under or in connection with this Agreement or any Merchant Application or Merchant Agreement; and

(3)    all **Processing Fees** listed in the table below and other amounts due to Service Providers.

| Transaction Fees | Base Cost | Percentage Share |
|---|---|---|
| Base Discount Fee (per Sales Volume) | | |
| American Express Surcharge | | |
| Authorization Fee | | |
| Batch Header Fee (per deposit) | | |
| PIN Debit and EBT Per Transaction Surcharge (per item) | | |
| AVS Fee (per item) | | |
| Fleet Card Surcharge | | |
| BuyPass Pre-Auth | | |
| **Monthly Fees** | **Base Cost** | **Percentage Share** |
| Account on File (incls AOF, Statement, CoPilot, & CardPointe) | | |
| PCI Compliance Program | | |
| Regulatory Compliance | | |
| **Other Fees** | **Base Cost** | **Percentage Share** |
| PCI Non-Compliance Fee (min of ▮▮▮ billed to merchant) | | |
| Chargebacks | | |
| Retrieval Fee | | |
| Customer Service and Help Desk Calls | | |
| Voice Authorization (per item) | | |
| Application Fee (One Time) (Optional) | | |
| Early Termination Fee (ETF) (Optional) | | |
| PCI Annual Fee (Optional) | | |
| Mail Paper Statements (includes Postage) | | |
| Confirmation Letters (includes Postage) | | |
| ACH Reject | | |
| Bank Wire | | |

Case 1:23-cv-03702-LGS   Document 1-1   Filed 05/02/23   Page 37 of 55

| Third Party Fees | Base Cost | Percentage Share |
|---|---|---|
| Wireless Setup Fee | | |
| Wireless Monthly Fee | | |
| Wireless Transaction Fee (per item) | | |
| MICROS/MerchantLink Authorization / Settlement Fee (per Auth) | | |

**Processing Fee Notes:**

1. Unless otherwise indicated above, pricing excludes pass through fees and charges such as association interchange, assessments, dues, and other association fees, postage, debit gateway fees, surcharges, datalines and Customer specific setup fees. Customer is responsible for all pass-through fees. Postage will be passed through at first class rates.

2. Additional terms applicable to fleet card Transactions: (1) Fleet Card transactions (including WEX Card Transactions and Voyager Card Transactions) processed pursuant to this Agreement are subject to fees and charges for authorization, ticket capture and related services set forth in this Agreement; (2) FDMS may modify FDMS Voyager Card Administration Fee structure or add additional fleet card fees upon 30 days prior written notice. FDMS reserves the right to establish at any time a separate card administration fee relating to alternate fuels, including but not limited to propane, compressed natural gas, E85, and M85.

3. PCI Non-Compliance Fees will not count toward any minimum fee calculations.

4. First Data may automatically enable the commercial card interchange service for merchants boarded to its systems. This service populates certain additional data elements on applicable Visa and MasterCard commercial card transactions that improve interchange qualification. First Data may set the rate at which applicable interchange savings are shared with eligible merchants and may debit ISO's monthly residual to reflect First Data's retained share of the applicable interchange savings.

5. Any product or service not included in the above pricing will be priced at First Data's current standard rate when the Client begins to use the product or service.

1.2    Welcome Kits

ISO shall be responsible, at its expense, for the creation and delivery of Merchant welcome kits.

**2      Minimum Processing Fees; Liquidated Damages**

2.1    In Processing Year 1, ISO will require and shall pay Service Providers for services sufficient to generate Processing Fees at least equal to⬛⬛(the **Year 1 Minimum Fees**). In each Processing Year after Processing Year 1, ISO will require and shall pay Service Providers for services sufficient to generate Processing Fees at least equal to⬛ of the Processing Fees paid during the immediately preceding Processing Year, but in no event less than⬛⬛(the **Minimum Processing Fees**). Service Providers shall calculate the total Processing Fees paid by ISO for services performed during each Processing Year (the **Total Annual Processing Fees**) within 120 days after the end of each Processing Year and will, after 10 days written notice to ISO, draw upon the Designated Account under Section 11 of this Agreement for the amount, if any, by which the Year 1 Minimum Fees or Minimum Processing Fees, as applicable, for the Processing Year exceed the Total Annual Processing Fees for the Processing Year. Based on economic assumptions material to each party underlying this transaction, ISO and Service Providers expressly agree that ISO shall pay Service Providers Processing Fees each Processing Year in an amount at least equal to the Year 1 Minimum Fees or Minimum Processing Fees, as applicable, until this Agreement expires or is terminated.

2.2    The parties agree that the fees and prices for services under this Agreement were determined by mutual agreement based upon certain assumed volumes of processing activity and the length of the Initial Term of this Agreement. ISO acknowledges that without the certainty of revenue from the Year 1 Minimum Fees and the Minimum Processing Fees, Service Providers would have been unwilling to

provide services at the prices in this Agreement. The parties agree it would be difficult or impossible to ascertain Service Providers' actual damages in the event of a termination of this Agreement due to a default by ISO before the expiration of the Initial Term. The parties agree that a reasonable estimation of the actual damages that Service Providers would suffer if this Agreement were terminated early due to a default by ISO is an amount equal to the sum of:

2.2.1    The Year 1 Minimum Fees or Minimum Processing Fees, as applicable, for the Processing Year in which the termination occurs (after crediting ISO for any fees paid during such Processing Year); plus

2.2.2    The sum of the Minimum Processing Fees in each full Processing Year (other than the year of termination) which remains during the Initial Term of this Agreement (the **Liquidated Damages**). The parties acknowledge and agree, after taking into account the terms of this Agreement and all relevant circumstances as of the date of this Agreement, that the Liquidated Damages payable under this Section represent a reasonable and genuine estimate of the actual damages that Service Providers would suffer in the event of early termination of this Agreement and is not a penalty.

2.2.3    Nothing in this Agreement shall limit Service Providers' right to recover from ISO:

(1)    any amounts for which ISO is liable under this Agreement other than for Processing Fees, or

(2)    any payment under any provision for indemnification under this Agreement. Nothing in this Agreement shall limit the right of any party to this Agreement to seek injunctive relief, to the extent available, for breaches of this Agreement.

**3**    PCI Compliance Service Program

3.1    Overview

3.1.1    First Data, itself or through an Affiliate or third party provider of PCI DSS audit and scan services and/or an approved scanning vendor (**PCI Provider**), will run a comprehensive communications campaign to inform Merchants about their responsibility to comply with PCI DSS and how to certify and validate their compliance and the fees associated with the PCI Compliance Service Program, as below.

3.1.2    Merchant Applications include a **Compliance Service Fee** and **Non-Receipt of PCI Data Validation Fine**. The **Compliance Service Fee** is in addition to and separate from any other annual fee that ISO may charge Merchants. Merchants who do not validate and/or maintain their PCI DSS compliance status under the PCI Compliance Service Program within three months after credit approval will be charged the **Non-Receipt of PCI Data Validation Fine**. The **Non-Receipt of PCI Data Validation Fine** will be charged in any given month after this three-month period in which the account is deemed non-compliant with PCI DSS. Merchants must maintain PCI DSS compliance at all times and recertify their compliance annually (or quarterly, as applicable) to avoid the **Non-Receipt of PCI Data Validation Fine**.

3.1.3    As part of the PCI Compliance Service Program, First Data or its PCI Provider will make available to Merchants a data security policy for use in their business; professional and online assistance with the completion of the self-assessment questionnaire; and, quarterly network scans (applies to Merchants with externally facing internet protocol addresses only) (collectively, the **PCI Rapid Comply Services**). Any other services that a Merchant may require in connection with PCI DSS compliance, including remediation services, are not included in the **Compliance Service Fee** or the **Non-Receipt of PCI Data Validation Fine**.

3.1.4 Upon successful certification of a Merchant's compliance with PCI DSS through the PCI Compliance Service Program, First Data will have the information necessary to meet the Payment Brands' Merchant PCI DSS compliance validation reporting requirements. Therefore, no reporting is required from ISO with respect to Merchant's PCI DSS validation efforts or status.

3.1.5 If ISO has elected to receive the **PCI Rapid Comply + Liability Waiver Bundle** (as noted in the Processing Fees schedule), the following additional conditions apply:

(1) As part of the PCI Compliance Service Program, ISO may offer Merchants the ability to purchase a liability waiver for eligible data security expenses from First Data for a price bundled to the PCI Rapid Comply Services.

(2) ISO will ensure that each Merchant that elects to receive the PCI Rapid Comply + Liability Waiver Bundle enters into the applicable terms and conditions for the PCI Rapid Comply + Liability Waiver Bundle (as such terms may be updated from time to time by First Data) (the **Bundle Service Terms**).

(3) As consideration for the availability of and pricing rate to ISO for the PCI Rapid Comply + Liability Waiver bundle, ISO will pay the PCI Rapid Comply + Liability Waiver Bundle fee for each Merchant boarded under this Agreement, regardless of whether the individual Merchant elects to receive the bundled services. First Data has no obligation to provide a liability waiver to Merchants that do not enter into the Bundle Service Terms.

3.2 PCI Compliance Service Program Fees

ISO shall pay the monthly fees and/or fines for the PCI Compliance Service Program as set forth in Section 1 of this Schedule A. Non-receipt of PCI Data Validation fines will not count toward ISO's Minimum Processing Fees under this Agreement.

3.3 Modifications to Program

Any aspect of the PCI Compliance Service Program is subject to change on 30 days' prior written notice from First Data or as necessary to comply with Payment Brand requirements.

3.4 No Guarantee; Allocation of Risk

Participation by ISO, Service Providers, or in Merchant in the PCI Compliance Service Program does not guarantee prevention of a data security breach or compromise and does not change the allocation of merchant risk and losses contemplated under this Agreement. First Data and Bank each reserve all its rights under a Merchant Agreement, including implementing or adding a reserve account, temporarily freezing processing activity on Merchants, or terminating services for non-compliance with Rules or Requirements of Law, as applicable.

4

Exh.2

# fiserv.

04/27/2022

SENT VIA FIRST CLASS MAIL AND EMAIL

Z Payments Solution Corp.
Attention: ▧▧▧▧▧ - President(Farouk Ziad )
649 E 169ᵗʰ Street
Suite 1B
Bronx, NY 10456

Re:   Notice of Breach of Marketing Agreement between Z Payments Solution Corp. (**ISO**),
      , First Data Merchant Services LLC (First Data) and Wells Fargo Bank, N.A. LLC (**Bank**)
      executed by First Data on June 30, 2021 (the **Agreement**).

Dear Mr. Ziad,

This letter is to notify you that you are in material breach of the Agreement, including but not
limited to, significant violations of the Program Standards. As a result of your breaches, First
Data has suspended ISO's ability to board new merchants. First Data recently learned that ISO
has been improperly boarding Merchant accounts in breach of the Agreement, including but
not limited to, by providing signatures on Merchant Applications from unauthorized
individuals.

Additionally, ISO boarded merchant accounts; MID ▧▧▧▧▧▧▧▧▧ , ▧▧▧▧▧▧▧▧▧
▧▧▧▧▧▧▧▧▧ , and ▧▧▧▧▧▧▧ when the merchant already had existing accounts under
an Agreement between Z-ATM Corp. (and CardConnect, LLC (an affiliate of First Data and
formerly known as Ignite Payments LLC) dated September 25, 2015 (the **Ignite Agreement**).
In addition to these findings, First Data found that several digital signatures and diligence
matching the same device used for signing. In concurrence with the discoveries, First Data was
also made aware of the below:



- ▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧▧ – First Data spoke with the signer and her
  husband who said they spoke with their agent, but did not sign anything physically or
  digitally. First Data asked them about the email address used for digital signature and
  they replied that they had no idea what that email was.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – First Data spoke with the signer who was unaware of any changes to their processing. They confessed it could have been their business partner, and were not familiar with the email address used for digital signature

Please answer the following questions or provide the requested information:

- Is it common for ISO to use emails and IP addresses that are not associated with the merchant?

- Provide details of the merchant boarding process and signature request.

- Explain the relationship between ISO and the Ignite Agreement.

- Advise the reason accounts have been boarded while still active with the Ignite Agreement after establishing with ISO.

- Provide sales processes for ISO.

Pursuant to Section 2.4 of the Agreement, ISO is obligated to comply with all Program Standards, and the above are only a few examples of ISO's material breaches of the Agreement and the Program Standards. However, as mentioned above, First Data has immediately suspended ISO's ability to board new Merchants due to ISO's material breaches and fraudulent activities while we continue our investigation. First Data reserves the right to terminate the Agreement pursuant to Sections 17.2(1), 17.2(1), or 17.2(3) or collect any losses associated with merchant or Merchant relationships pursuant to Section 4.4. Additionally, be advised that this Letter is without waiver of any position, right, claim or defense available to First Data or Bank under the Agreement or under applicable law, all of which are hereby expressly reserved.

Please be advised that should you fail to adequately and timely respond to this notification or engage in additional breaches of the Agreement or violations of the Program Standards or

policies that may result in First Data invoking any and all of our various rights under the Agreement.

First Data requires a response to the above requests within 48 hours of receipt.

Sincerely,

*Tieon Goodrich*

Tieon Goodrich
Business Analyst
First Data Merchant Services LLC

cc: Amanda Jones — Director Project Management II

**First Data Merchant Services**

Dear Tieon Goodrich

We at Z Payments Solution Corp, work very hard to try our best **NOT** to breach the Agreement, in any way or another unless it is inattention. But at the same time we at Z Payments Solution Corp "suspended ISO's ability to board new merchants" it is unfair.

Before I begin to answer your questions , I am going to go over the letter section by section.

# Section 1

Providing signatures on Merchant Applications from unauthorized individuals. **No Merchant application was given in this section for us to look at deep and see if that really happens.** But since we are talking about Merchant Applications from unauthorized individuals. I move to the two example you give ███████████████████████

███████████

Both phone calls ~~were unclear to the Merchant and both were scam calls and they~~ called us right away and informed me that someone is calling. We are Z Payments Solution Corp called the number and also sent out email to work together to make sure it's not Scame. Since the Merchant called us this itself they did sign for the application one way or another.

In attention both accounts have agreed to sign Affidavit to confirm this side of the store.

## Section2

**Additionally, ISO boarded merchant accounts; MID ██████████████████████**
**██████████████, and ████████████ when the merchant already had existing accounts under an Agreement between Z-ATM Corp.**

going two merchant ██████████████████████████████
███████████

As mentioned in section one ██████████████ never had a Merchant account before whatsoever.

██████████████████████████ in other hand accounts with maverick payments. Please see the attachment we reviewed for the price.

Also you add it ██████████████████████ this  account  with Bank of
America

██████████████████████ new business never had an
account before.

## Section 2.1

**When the merchant already had existing accounts under an Agreement between
Z-ATM Corp.**
We are not aware that we can not take accounts from certain partners whether we know them
or not.

## Section 2.3

**In addition to these findings, First Data found that several digital signatures and
diligence matching the same device used for signing.**

This only happens when  the Underwriting has to take 5 days to review the accounts. We
asked the Underwriting team in the meeting with them if it was ok to use the sales
peronse device to sign the application and their Hot spot and maybe ip address will
match?
and we were informed  it is not an issue to use the same device or hotspot if this will
speed the application process to get auto approved.

by **Pisano, Laura  or Langton, Jackie on the meeting happens  Z Payments - Fiserv
Underwriting Discussion**
**Wednesday, February 16· 3:30 – 4:00pm.**

# Section 3

Please answer the following questions or provide the requested information:

- **Is it common for ISO to use emails and IP addresses that are not associated
with the merchant?**

    **This is not Common to use emails not associated with the merchant.**

    **IP addresses, we were** missguided on the meeting

- Provide details of the merchant boarding process and signature request.

1. The merchant will get a hard copy of the MPA and program

2. Then the sales rep will add the information to the system and make a built application. with email to them or make them sign on the Tablet they have with them and at the same time take their id and ss card and void check .
3. The application sends the office work to review the application and call the merchant to confirm if they need anything missing.
4. either email the a
5. then we will wait for the UN response and if the UN comes back with something wrong we notify the Merchant.

- Explain the relationship between ISO and the Ignite Agreement.

   There is not relationship with this Z Payment and or Ignite Agreement

   not even sure what Ignite Agreement is  Z-ATM Corp,

   We do partner with Z-ATM Corp with the ATM side and my undsrating they do not have any credit card service .

- Advise the reason accounts have been boarded while still active with the Ignite Agreement after establishing with ISO.

   When this ISO was established we  originally came from  Tsys and still  with them only Clover brought us over. If we have a sales rep  bring accounts from any FIServ change we do not stop any of them. and we were not told we can't  take ignite or  cardconnect accounts. That said, this   Merchant issue is to open with us and not close their accounts with their other processor.

- Provide sales processes for ISO.

   Process of sale is waking into the business and we have sales responses   and every location we are bored. That said, visiting the location and closing the deal on the spot is 99% of our sale process. We may have a few phone calls.

Exh.3

DocuSign Envelope ID: 99B484D9-CAF5-49C3-9C97-5682597A79EA

# fiserv.

5/27/2022

SENT VIA FIRST CLASS MAIL AND EMAIL

Z Payments Solution Corp.
Attention: Nabil Ziad - President
649 E 169th Street
Suite 1B
Bronx, NY 10456

Re:    Material Breach and Termination Notice of Marketing Agreement between Z Payments Solution
Corp. (**ISO**), First Data Merchant Services LLC (**First Data**) and Wells Fargo Bank, N.A. LLC (**Bank**)
executed by First Data on June 30, 2021 (the **Agreement**).

Dear Mr. Ziad,

First Data provides this letter as: (i) additional notice of ISO's material breaches of the Agreement; (ii) First
Data's notice of termination of the Agreement as a result of ISO's material breaches. Initially capitalized
terms used in this notice, but not otherwise defined, have the meanings set forth in the Agreement.

On April 27, 2022, we sent you the attached letter regarding Material Breaches (the **Breach Letter**)
detailing violations of the Program Standards and material breaches of the Agreement, including but not
limited to fraudulent activity by ISO and actions deemed injurious to Service Providers.

This letter is to notify you that we are terminating the Agreement as a result of your material breaches of
the Agreement, including but not limited to, the fraudulent activities that we have notified you of and the
significant violations of the Program Standards. As a result of your breaches, First Data has already
suspended ISO's ability to board new merchants. Upon further investigation related to the Breach Letter
and other incidences, First Data has confirmed that ISO has been improperly boarding Merchant accounts
in breach of the Agreement, including but not limited to, by providing signatures on Merchant
Applications from unauthorized individuals.

Additionally, ISO boarded merchant accounts; MID ███████████████████████████ and
███████████ when the merchant already had existing accounts under an Agreement between Z-ATM
Corp. (and CardConnect, LLC, an affiliate of First Data, formerly known as Ignite Payments LLC) dated
September 25, 2015 (the **Ignite Agreement**). In addition to these findings, First Data found that several
digital signatures and diligence matching the same device used for signing, and certain user profiles were
used in connection with both ISO and the Ignite Agreement.

1

DocuSign Envelope ID: 99B484D9-CAF5-49C3-9C97-5682597A79EA

In the Breach Letter, First Data requested additional information, and ISO has failed to provide satisfactory information. Additionally, First Data has become aware of inconsistencies and misrepresentations in ISO's April 28, 2022, response to the Breach Letter.

As we previously explained, pursuant to Section 2.4 of the Agreement, ISO is obligated to comply with the Agreement and the Program Standards. The violations described in the Breach Letter are only a few examples of ISO's material breaches of the Agreement and the Program Standards, and are incorporated herein. As a result of ISO's material breaches, fraudulent activity, and other actions deemed injurious to Service Providers, the Agreement will be terminated pursuant to Sections 17.2(1), (2), and (3) as described herein.

The parties agree that the liquidated damages due and payable pursuant to the Agreement by ISO to First Data would be greater than or equal to $234,462.27, plus other amounts payable to First Data's affiliates (the **"Contract Damages"**). Nevertheless, subject to the terms of this letter agreement, and conditioned upon ISO's satisfaction of the following requirements (collectively, the **"Conditions Precedent"**), First Data will agree not to collect the Contract Damages:

(A) ISO shall countersign this letter agreement evidencing its acknowledgment of, and agreement to, the terms of this letter agreement on or before May 31, 2022 (the **"Cutoff Date"**); and

(B) ISO shall pay First Data $100,000 (the **"Termination Payment"**) on or before the Cutoff Date.

If all the Conditions Precedent are satisfied, then the Agreement shall be deemed to have been terminated by mutual agreement of the parties effective as of the date on which First Data receives the Termination Payment (the **"Termination Date"**). If any of the Conditions Precedent remain unsatisfied as of the date immediately following the Cutoff Date, then the Contract Damages will be immediately due and payable by ISO to First Data, and First Data may bring any causes of action permitted under the Agreement or applicable law.

As partial consideration for First Data's agreement not to collect the Contract Damages as contemplated in this letter agreement:

A. during the Term and at all times thereafter, ISO shall not, directly or through any person or any other entity, make any public or private statements (whether orally, in writing, via electronic transmission, or otherwise) that disparage, denigrate, or malign First Data, Bank, or any of their respective Affiliates, businesses, products, services, activities, operations, affairs, reputations, prospects, officers, employees, directors, partners, agents, members, or shareholders; provided, for purposes of clarification, and not limitation, that: (i) a statement shall be deemed to disparage, denigrate, or malign a person or entity if such statement could be reasonably construed to adversely affect the opinion any other person or entity may have or form of such first person or entity; and (ii) the foregoing limitations shall not be violated by truthful statements made by ISO (a) to any governmental authority, or (b) in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings; and

2

DocuSign Envelope ID: 99B484D9-CAF5-49C3-9C97-5682597A79EA

B. ISO shall indemnify, defend, and hold harmless First Data and Bank from and against any and all Damages suffered or incurred as a result of any breach of its obligations under this Letter agreement.

C. The parties further agree that:

    (A) First Data will no longer be obligated to make residual payments to ISO;

    (B) ISO shall immediately discontinue any promotion and recommendation of the Program;

    (C) Service Providers will service all Merchants boarded under the Agreement;

    (D) Service Providers may commence legal action to enforce fully their rights as set forth in the Agreement, including collection of all amounts due to Service Providers;

    (E) ISO shall continue to comply with the Nonsolicitation Obligation until the date that is 24 months following the Termination Date;

    (F) ISO will be deregistered with VISA and MasterCard as a member service provider and independent sales organization and any similar registrations with other Payment Brands;

    (G) ISO must discontinue using the names and Marks of Bank and First Data for any and all purposes, which means, without limitation, that ISO (i) shall no longer distribute any materials bearing such names or Marks, (ii) shall no longer place or in any way utilize advertising bearing such names or Marks, (iii) shall no longer utilize such names or Marks to advance ISO's interests, (iv) shall discontinue such names and Marks and remove them from the public record, including but not limited to websites, yellow pages, and telephone numbers associated with Service Providers, and (v) shall no longer represent ISO as having any relationship to Bank or First Data; and

    (H) ISO will immediately destroy any materials in ISO's possession that reference the names or Marks or return such materials to:

Attention: General Counsel's Office
4000 NW 120th Avenue, MS/CON – Partner Solutions
Coral Springs, FL 33065

Be advised that ISO may still be responsible for any losses associated with merchant or Merchant relationships pursuant to Section 4.4.

Nothing in this Letter shall be construed as a waiver of any rights or remedies afforded to First Data under the Agreement and applicable law, including but not limited to the right to collect attorneys' fees and other fees.

Sincerely,

Tieon Goodrich
Business Analyst
First Data Merchant Services LLC
cc: Amanda Jones — Director Project Management II

DocuSign Envelope ID: 99B484D9-CAF5-49C3-9C97-5682597A79EA

**Understood, acknowledged, and agreed:**

**ISO: Z Payments Solution Corp.**

By: _____

Name: Farouk Nabil Ziad _____

Title: Vice President _____

Date: _____

4

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-----------------------------------------------------------------------X          Index # 651678/2023

Z PAYMENTS SOLUTION CORP.


                                    Plaintiff

          v.                                                    AFFIDAVIT OF SERVICE


FIRST DATA MERCHANT SERVICES LLC and

FISERV, INC.

                                    Defendant.

-----------------------------------------------------------------------X

State of New York   )

County of New York) ss:

I, Johnny Wu, being duly sworn do hereby state under penalty of perjury that:

1. I am over 18 years of age and not a party to this action.

2. That I reside at Brooklyn, N.Y.

3. That on April 4, 2023 I caused to be served on the following party a copy of the attached
Summons and Complaint by depositing same in a repository of the U.S. Postal Service postage
paid envelope addressed as below:



                    First Data Merchant Services LLC
                    4000 NW 120th Avenue
                    Coral Springs, Fl. 33065



Sworn to before me this 4th day of April, 2023

at New York, NY.                                            Johnny Wu

· KAI YIN LIU
Notary Public, State of New York
No. 02LI6182533
Qualified in New York County
Commission Expires Feb. 25, 2024

1 of 1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-----------------------------------------------------------------------X         Index # 651678/2023

Z PAYMENTS SOLUTION CORP.


                                          Plaintiff

                    v.                                           AFFIDAVIT OF SERVICE


FIRST DATA MERCHANT SERVICES LLC and

FISERV, INC.

                                          Defendant.

-----------------------------------------------------------------------X

State of New York   )

County of New York) ss:

I, Johnny Wu, being duly sworn do hereby state under penalty of perjury that:

1. I am over 18 years of age and not a party to this action.

2. That I reside at Brooklyn, N.Y.

3. That on April 4, 2023 I caused to be served on the following party a copy of the attached
Summons and Complaint by depositing same in a repository of the U.S. Postal Service postage
paid envelope addressed as below:



                    Fiserv, Inc.

                    255 Fiserv Drive,

                    Brookfield, Wisconsin 53045



Sworn to before me this 4th day of April, 2023

at New York, NY.                                                Johnny Wu

KAI YIN LIU
Notary Public, State of New York
No. 02LI6182533
Qualified in New York County
Commission Expires Feb. 25, 2024

## AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

SUPREME COURT
STATE OF NEW YORK, COUNTY OF NEW YORK

Purchased/Filed:

Index # 651678/2023

---

Z Payments Solution Corp.

Plaintiff

against

First Data Merchant Services LLC and Fiserv, Inc.

Defendant

---

STATE OF NEW YORK
COUNTY OF ALBANY

SS.:

_____ JAMES PERONE _____, being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ April 5, 2023 _____, at __11:00 AM__, at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Summons and Verified Complaint

on

_____ First Data Merchant Services LLC _____, the

Defendant in this action, by delivering to and leaving with _____ Nancy Dougherty _____,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of

the Secretary of State of the State of New York, 99 Washington Avenue, Albany, NY, 2 true copies thereof and that

at the time of making such service, deponent paid said Secretary of State a fee 40 dollars; That said service was

made pursuant to Section 303 Limited Liability Company Law. Deponent further says that deponent knew the

person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly

authorized to accept such service on behalf of said defendant

Description of the person served: Approx. Age: __55-60__ Approx. Wt: __130lbs__ Approx. Ht: __5'3"__

Color of skin: __White__ Hair color: __Black__ Sex: __Female__ Other: _____

Sworn to before me on this

__5th__ day of April 2023

SCOTT SCHUSTER
NOTARY PUBLIC/STATE OF NEW YORK
NO. 01SC6308636
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES JULY 28, 2026

JAMES PERONE
Attny's File No.
Invoice-Work Order # S1890924

**SERVICO. INC.. P.O. BOX 871. ALBANY. NY 12201**

## AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

SUPREME COURT
STATE OF NEW YORK, COUNTY OF NEW YORK

Purchased/Filed:

Index # 651678/2023

*Z Payments Solution Corp.*

Plaintiff

against

*First Data Merchant Services LLC and Fiserv, Inc.*

Defendant

STATE OF NEW YORK
COUNTY OF ALBANY

SS.:

_____JAMES PERONE_____ , being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ April 5, 2023 _____ , at __11:00 AM__ , at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Summons and Verified Complaint

on

_____ Fiserv, Inc. _____ , the

Defendant in this action, by delivering to and leaving with _____ Nancy Dougherty _____ ,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of

the Secretary of State of the State of New York, 99 Washington Avenue, Albany, NY, 1 true copies thereof and that

at the time of making such service, deponent paid said Secretary of State a fee 40 dollars; That said service was

made pursuant to Section 307 Business Corporation Law. Deponent further says that deponent knew the person

so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly

authorized to accept such service on behalf of said defendant

Description of the person served: Approx. Age: __55-60__ Approx. Wt: __130lbs__ Approx. Ht: __5'3"__

Color of skin: __White__ Hair color: __Black__ Sex: __Female__ Other: _____

Sworn to before me on this

__5th__ day of April 2023

SCOTT SCHUSTER
NOTARY PUBLIC, STATE OF NEW YORK
NO-01SC6368636
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES JULY 28, 2026

JAMES PERONE
Attny's File No.
Invoice•Work Order # S1890925

**SERVICO. INC.. P.O. BOX 871. ALBANY. NY 12201**

2 of 2